## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JACOB E. PEAVY, INDIVIDUALLY AND | § | |
| AS TRUSTEE OF THE JACOB E. PEAVY | § | |
| REVOCABLE TRUST, and | § | |
| KATIE L. PEAVY, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CASE NO. 17-0142-KD-MU |
| | § | |
| BARRY AXELROD, | § | |
| | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION

This cause is before the Magistrate Judge for issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(S), on Defendant's motion to dismiss for lack of personal jurisdiction or, alternatively, to transfer venue of the action pursuant to 28 U.S.C. §§ 1406(a) and 1631 (Doc. 11; *see also* Docs. 13 & 17) and Defendant's motion to transfer venue pursuant to 28 U.S.C. § 1404(a) (Doc. 14; *see also* Docs. 15-16); Plaintiff's responses thereto (Docs. 22-23), and the Defendant's replies (Docs. 28-29). Upon consideration of the contents of the pleadings and all pertinent materials submitted in support thereof, as well as the arguments of counsel at oral hearing on May 25, 2017, the Magistrate Judge recommends that the Court **DENY** Defendant's motion to dismiss for lack of personal jurisdiction and **DENY** Defendant's requests to transfer venue pursuant to 28 U.S.C. §§ 1404(a), 1406(a), and 1631 (*see* Docs. 11 & 14).

## STANDARD OF REVIEW

As an initial matter, Plaintiffs have the burden to establish a *prima facie* case of personal jurisdiction over the nonresident Defendant. *Andy's Music, Inc. v. Andy's Music, Inc.*, 607

F.Supp.2d 1281, 1285 (S.D. Ala. 2009) (citations omitted). "Plaintiff's burden in alleging personal jurisdiction is to plead sufficient material facts to establish the basis for exercise of such jurisdiction." *Future Technology Today, Inc. v. OSF Healthcare Sys.,* 218 F.3d 1247, 1249 (11th Cir. 2000) (citation omitted); *see also United Technologies Corp. v. Mazer,* 556 F.3d 1260, 1274 (11th Cir. 2009) ("A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." (citations omitted)). "The district court must accept the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendant's affidavits. . . . [W]here the plaintiff's complaint and the defendant's affidavits conflict, the district court must construe all reasonable inferences in favor of the plaintiff." *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990); *see also PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.,* 598 F.3d 802, 810 (11th Cir. 2010) ("Where the evidence presented by the parties' affidavits and deposition testimony conflicts, the court must construe all reasonable inferences in favor of the non-movant plaintiff. . . . If such inferences are sufficient to defeat a motion for judgment as a matter of law, the court must rule for the plaintiff, finding that jurisdiction exists." (citation, internal marks and footnote omitted)).

### **FINDINGS OF FACT**[1]

Plaintiffs assert claims against Defendant Barry Axelrod ("Axelrod" or "Defendant") for breach of fiduciary duties, breach of contract, and fraudulent concealment arising from Axelrod's alleged failure to disclose to them numerous transfers totaling millions of dollars from the Charles Schwab brokerage account for the Jacob E. Peavy Revocable Trust.  (*See generally* Doc. 1, Exhibit 1, COMPLAINT.) Plaintiffs allege that Axelrod never communicated with them about

---

[1] To the extent that any findings of fact are deemed to be conclusions of law, they are so adopted. To the extent that any conclusions of law are in fact findings of fact, they are so adopted.

the existence, amount, or details of the wire transfers.  (*Id.* at ¶ 18; *see* Doc. 3, Answer, at ¶ 18 ("It is admitted large transfers were made and that Axelrod did not communicate with the Peavys about investment advice because that was Narayan's role.")).  Plaintiffs also allege that they never received the Charles Schwab brokerage statements (Doc. 1, COMPLAINT, at ¶ 13), that the actual wire transfer authorization sheets appear to bear the forged signature of Jacob Peavy ("Peavy"), and that the amounts of the transfers were out of character for Peavy (*id.* at ¶ 18).  Despite his admission that he received the brokerage statements from Charles Schwab (Doc. 3, at ¶ 10) and evidence that he used the brokerage statements to prepare the financial statements that he sent to Peavy (*see* Doc. 13, Declaration of Barry Axelrod ("Axelrod Dec."), at ¶ 36 & Exhs. I & J to Axelrod Dec.), Axelrod denies that he was responsible for monitoring the account and reporting account activity to Peavy (Doc. 3, at ¶ 18 ("Axelrod . . . denies that he was to be monitoring the Charles Schwab brokerage statements other than to provide a summary of the ending value shown on the statements.")).

In October 2003, Peavy—whose homestead has always been in Alabama (Doc. 22, Exhibit A, Declaration of Jacob E. Peavy ("Peavy Dec."), at ¶ 2)—entered into a Representation Agreement with Axelrod, pursuant to which Axelrod was to serve as Peavy's player agent for purposes of negotiating Peavy's contracts with Major League Baseball ("MLB") teams (*id.* at ¶ 5; Doc. 13, Axelrod Dec., at ¶ 23).  Axelrod admits he sent Peavy the Representation Agreement (Doc. 13, Axelrod Dec. at, ¶ 25). The Representation Agreement was addressed to Peavy in Semmes, Alabama.  (Doc. 22, Peavy Dec., at ¶ 5 & Exh. A-1 to Peavy Dec.).[2] Axelrod signed the Representation Agreement in his individual capacity. (*Id.*).

---

[2] Axelrod contends that he hand-delivered the Representation Agreement and related forms to Peavy in California.  (Doc. 13, Axelrod Dec., at ¶ 23.)  However, he also has stated that after receiving the signed Representation Agreement from Peavy in the mail, he executed it in California and, in early November 2003, "sent" Peavy a fully-executed copy.  (*Id.* at ¶ 25.)

Axelrod included in the Representation Agreement his offer to provide a variety of additional services to Peavy in exchange for an additional fee of up to one percent (1%) of Peavy's MLB contract with the final fee to be negotiated based upon the extent of services desired by Peavy.  (*Id.*, Exh. A-1 to Peavy Dec., at 2-3.)  The additional services offered are as follows:

- Advice regarding investments and business opportunities;
- Maintenance of business checking accounts and service as a collection point for earnings, which shall be deposited and utilized to pay bills submitted by creditors;
- Assistance with preparation and maintenance of a budget;
- Provision of preliminary and general legal counsel;
- Review and advice regarding tax planning and preparation;
- Maintenance of accounting records for all transactions sufficient to prepare tax returns and other financial statements;
- Coordination of preparation of State and Federal income tax returns.

(*Id.* (referenced herein as the "Financial Management Services")).

In late 2003 or early 2004, a few months after Peavy and Axelrod executed the Representation Agreement, Axelrod traveled to Mobile, Alabama, to get to know Peavy better and meet his family. (Doc. 13, Axelrod Dec., at ¶ 31.)[3]  During this visit, Axelrod discussed the services that he was prepared to provide to Peavy, such as payment of all bills and the creation of an annual budget to govern spending and savings.  (Doc. 22, Peavy Dec., at ¶ 6.)

Axelrod began to provide personal financial statements to Peavy in February of 2005. (Doc. 13, Axelrod Dec., at ¶ 36). Axelrod began to provide certain additional Financial Management Services to Peavy in 2006, including, but not limited to, receiving Peavy's paychecks, depositing them into Peavy's Wells Fargo bank account, writing checks or making transfers to other bank accounts held by the Peavys or by The Jacob E. Peavy Foundation (the

---

[3] This was not the first time Axelrod visited Alabama. Axelrod admits that he traveled to Alabama on a number of occasions during the 1990s to participate in an annual charity softball tournament event with one of his clients, Mark Harmon.  (*Id.*)

"Peavy Foundation"), and paying bills of the Peavys and the Peavy Foundation for car payments, insurance, utilities, cell phones, and other matters.  (*Id.* at ¶ 40; *see also* Doc. 22, Peavy Dec., at ¶¶ 6-7).  Axelrod also prepared and furnished Peavy annual budgets to govern the Peavys' spending and savings.  (*See id.* at ¶ 6.)

Axelrod provided the Financial Management Services continuously over the course of the next decade.  Peavy presented uncontroverted evidence that as his MLB career progressed, his assets, finances, investments, business ventures, and charitable foundations grew and became increasingly complex, and thus his reliance on Axelrod to perform the Financial Management Services on his behalf increased.  (*See id.* at ¶ 15.)  Peavy states that he heavily relied upon Axelrod's services and followed the practice of having Axelrod, as the provider of Financial Management Services, involved in all of Peavy's financial affairs.  (*Id.* at ¶ 8.)  Peavy further states that Axelrod played a key role in the execution of the plan to preserve Peavy's income for retirement and that he helped track every dollar that Peavy earned.  (*See id.* at ¶ 6.)

As part of his efforts to deliver the Financial Management Services, Axelrod admits to meeting on several occasions with Peavy and Peavy's then-investment advisor, Ash Narayan ("Narayan") of RGT Capital Management ("RGT"), a financial services firm headquartered in Dallas, Texas. (*See* Doc. 3, at ¶ 12.)  In addition to performing Financial Management Services for Peavy (Doc. 13, Axelrod Dec., at ¶ 40), Axelrod also admits that he sent the remainder of Peavy's salary, after allocating a portion of Peavy's salary to reserves and expenses, to RGT (Doc. 3, at ¶ 12), where Peavy was accumulating cash for retirement.  Peavy has stated that Axelrod was involved in nearly every telephone call and meeting he had with Narayan regarding financial matters (Doc. 22, Peavy Dec., at ¶ 8) and, further, has established that Axelrod prepared

annual budgets to govern his spending and savings continuously during their relationship. (*id.* at ¶ 6).

Beginning in February 2005, Axelrod prepared monthly financial statements for Peavy (Doc. 13, Axelrod Dec. at ¶ 36). Axelrod admits to mailing financial statements to Peavy on occasion (*id.*), some of which were mailed to Peavy's office in Mobile, Alabama (Doc. 22, Peavy Dec., at ¶ 16). The financial statements included certain details from the Charles Schwab brokerage statements, such as the current balance of the account. (*See* Doc. 13, Exh. J to Axelrod Dec.) Peavy stated that he relied on the representations set forth in the financial statements in making decisions on business ventures in the Mobile area. (Doc. 22, Peavy Dec,. at ¶ 16.)

Over the next several years, Axelrod became involved in a number of Peavy's activities in Alabama. Beginning in 2008, Axelrod assisted Peavy with purchases of real property near Catherine, Alabama ("Southern Falls"), by interfacing directly with Peavy's Alabama-based real estate broker, Darren McGilberry, for the acquisition of parcels of land in a series of transactions. (*Id.* at ¶ 17.) Axelrod also procured insurance for Peavy's real properties and aided in the development, management, and budgeting of Southern Falls. (*Id.* at ¶¶ 17-19; Doc. 22, Exhibit B, Declaration of Daniel Lewis "Luke" Peavy ("L. Peavy Dec."), at ¶ 6.) In connection with those services, Axelrod routinely communicated with Peavy's brother, Luke Peavy—mostly by e-mail—about the operational and business matters at Southern Falls. (Doc. 22, Peavy Dec., at ¶ 19; Doc. 22, L. Peavy Dec., at ¶¶ 5 & 6.) At all pertinent times, Luke Peavy resided in Mobile, Alabama. (*Id.*)

Additionally, in 2008, Axelrod was named as the successor trustee of the Jacob E. Peavy Revocable Trust ("revocable trust") that Peavy created. The revocable trust was governed by

Alabama law.  (Doc. 22, Peavy Dec., at ¶ 9.) In May 2012, Axelrod was appointed trustee of the newly created Jacob E. Peavy and Katie L. Peavy Irrevocable Life Insurance Trust, which was created under and governed by the laws of Alabama.  (*Id.* at ¶ 11 & Exh. A-2 to Peavy Dec.) Axelrod also acted as Peavy's general counsel in 2013, when he provided legal advice with respect to a lawsuit filed against Peavy in Alabama state court.  (Doc. 22, Peavy Dec., at ¶ 21.) In that role, Axelrod directed Peavy's Alabama local counsel on how to manage and resolve a lawsuit relating to a lien placed on Peavy's Alabama real property.  (*See id.*).

In November 2010, Axelrod traveled to Mobile, Alabama, to attend the wedding of Peavy's brother, Luke.  (Doc. 13, Axelrod Dec., at ¶ 93; Doc. 22, L. Peavy Dec., at ¶ 3.) Peavy presented evidence that, while in Alabama, Axelrod reviewed business matters with him.  (Doc. 22, Peavy Dec., at ¶ 10.)[4]

In early 2012, Axelrod ceased serving as Peavy's player agent. (Doc. 13, Axelrod Dec., at ¶¶ 99-101; Doc. 22, Peavy Dec., at ¶ 12.) Nevertheless, Axelrod admits he continued to provide the Financial Management Services to Peavy. (Doc. 13, Axelrod Dec., at ¶¶ 99 & 106-15.) Indeed, during the next four years, Axelrod had numerous contacts with Peavy and Peavy's representatives and consultants in Alabama. Axelrod sent invoices addressed to Peavy's home in Alabama for the Financial Management Services (Doc. 22, Peavy Dec., at ¶ 14) and admits that he mailed financial statements to Peavy in Alabama, which included information obtained from the Charles Schwab statements regarding the Jacob E. Peavy Revocable Trust (*see* Doc. 13, Axelrod Dec., at ¶ 36 and Exhs. I & J to Axelrod Dec.). In addition, Axelrod admits that he communicated by telephone with Peavy regarding his finances (*see* Doc. 3, at ¶ 21), and it is

---

[4] The parties disagree as to whether Axelrod and Peavy discussed business on this visit. (*Compare id. with* Doc. 13, Axelrod Dec., at ¶ 93 ("There were no professional services requested of me or rendered by me during this visit. . . . I did not conduct any business in Alabama on this visit.")). Because Plaintiffs have presented evidence that business was discussed, the undersigned concludes for the purpose of deciding the pending motions that this is true.

clear that Peavy was in Alabama when he received some of those calls (Doc. 1, COMPLAINT, at ¶ 21). Axelrod also admits he communicated with Peavy's Alabama-based consultant, Joan Dunlap, by telephone about financial matters concerning Peavy. (Doc. 13, Axelrod Dec., at ¶ 115; Doc. 3, at ¶ 24). Peavy has also presented evidence that Axelrod communicated with Luke Peavy by telephone and e-mail about the Peavys' investments and finances. (Doc. 22, Peavy Dec., at ¶ 19; *see also id.,* L. Peavy Dec., at ¶¶ 4-6).

In November or December 2013—following the end of the baseball season in which Peavy and his team, the Boston Red Sox, won the World Series—Axelrod admits he visited Peavy at his home in Catherine, Alabama.  (*Compare* Doc. 13, Axelrod Dec., at ¶ 106 *with* Doc. 22, Peavy Dec., at ¶ 13). Narayan also was present at that meeting (*see id.* at ¶ 13), as was Peavy's brother, Luke, who served as Axelrod's contact, mostly through email, with respect to his supervision, operation and management of Peavy's finances, investments, business ventures, and charitable foundations (Doc. 22, Peavy Dec., at ¶ 13; Doc. 22, L. Peavy Dec., at ¶ 7). Axelrod admits that during the meeting, he, Peavy, Narayan, and Luke Peavy discussed business, including Peavy's bank finances and real estate investments. (Doc. 13, Axelrod Dec., at ¶ 106). Peavy claims that at no time during that meeting, or in any prior communications, did Axelrod alert him that millions of dollars were being transferred from the Charles Schwab brokerage account and loaned to or invested in The Ticket Reserve, LLC ("TTR").  (Doc. 1, COMPLAINT, at ¶¶ 20-21).

Axelrod admits that he again traveled to Mobile, Alabama in January of 2016 to meet with Peavy at his office and discuss business. (Doc. 13, Axelrod Dec., at ¶ 114). Narayan and Luke Peavy, as well as other individuals who consulted with Peavy on his Alabama charitable, business, and real estate matters, were present for that meeting.  (*Id.*; *see also* Doc. 22, Peavy

Dec., at ¶ 22; Doc. 22, L. Peavy Dec., at ¶ 8). During this meeting, Axelrod admits that he, Peavy, and the other attendees discussed Peavy's investments in the Mobile real estate market. (Doc. 13, Axelrod Dec., at ¶ 114; Doc. 3, at ¶ 23).

Shortly after that meeting, in early February 2016, Joan Dunlap reported to Peavy that she had received a phone call from Axelrod regarding Peavy's investments and real estate developments. (Doc. 22, Peavy Dec., at ¶ 23). She later reported to Peavy a second phone call that she received from Axelrod on the same subject. (*Id.*).

Axelrod ceased providing the Financial Management Services to Peavy in mid-2016 (Doc. 13, Axelrod Dec., at ¶ 124; *see also* Doc. 22, Peavy Dec., at ¶ 25) and mailed a resignation letter to Peavy in Mobile, Alabama (Doc. 22, Exh. A-9 to Peavy Dec. ("This letter is for the purpose of submitting my resignation as an Officer and Director of The Jake Peavy Foundation, effective immediately.")).

## CONCLUSIONS OF LAW

### I.    Motion to Dismiss for Lack of Personal Jurisdiction.

Personal jurisdiction in this action against Axelrod, a non-resident defendant, is predicated upon Alabama's long-arm statute that, in part, provides:

> An appropriate basis exists for service of process outside of this state upon a person or entity in any action in this state when the person or entity has such contacts with this state that the prosecution of the action against the person or entity in this state is not inconsistent with the constitution of this state or the Constitution of the United States[.]

Ala.R.Civ P. 4.2(b). In a diversity action, like the present one (*compare* Doc. 1, COMPLAINT, at ¶ 2 (noting that "Axelrod is a non-resident individual") *with* Doc. 3, at ¶ 3 ("Admitted that this Court has subject matter jurisdiction based on diversity of citizenship.")), "a federal court may assert jurisdiction over a nonresident defendant only to the extent permitted by the long-arm

statute of the forum State, and only if the exercise of jurisdiction comports with the requirements of the Due Process Clause of the Fourteenth Amendment." *Vermeulen v. Renault U.S.A., Inc.*, 975 F.2d 746, 753 (11th Cir. 1992) (citations omitted), *opinion modified and superseded on other grounds*, 985 F.2d 1534 (11th Cir. 1993). However, where "the courts of the forum State have interpreted the forum's long-arm statute to confer jurisdiction to the limits allowed by federal due process, state law need not be applied[.]" *Id.* at 753; s*ee also Sloss Industries Corp. v. Eurisol,* 488 F.3d 922, 925 (11th Cir. 2007) (recognizing merger of the two inquiries of whether the exercise of personal jurisdiction comports with the forum's long-arm statute and the requirements of the due process clause of the Fourteenth Amendment "because Alabama's long-arm statute permits the exercise of personal jurisdiction to the fullest extent constitutionally permissible."); *Mutual Serv. Ins. Co. v. Frit Indus., Inc.*, 358 F.3d 1312, 1319 (11th Cir. 2004) ("Alabama's long-arm statute authorizes Alabama courts to assert jurisdiction to the fullest extent constitutionally permissible."); *Molex Co., LLC v. Andress*, 887 F.Supp.2d 1189, 1198 (N.D. Ala. 2012) (same). Rather, the Court "need only ask whether the exercise of jurisdiction over the nonresident defendant comports with due process." *Vermeulen*, 975 F.2d at 753; *see also Molex*, 887 F.Supp.2d at 1198–99 (citations omitted) (noting that "the traditional two-step personal jurisdiction inquiry of assessing the propriety of jurisdiction under the forum state's long-arm statute, and then determining whether the exercise of jurisdiction would violate the Due Process Clause of the Fourteenth Amendment, collapses into a single step in Alabama[]").

A nonresident defendant is amenable to a forum's personal jurisdiction if: "(1) [he] possesses sufficient minimum contacts with the forum State to satisfy due process requirements, and (2) the forum's exercise of jurisdiction comports with '"traditional notions of fair play and substantial justice."'" *Vermeulen*, 975 F.2d at 754, quoting in part *International Shoe Co. v.*

*Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95 (1945), in turn quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.C.t 339, 343, 85 L.Ed. 278 (1940); *see also Madara, supra,* 916 F.2d at 1516 (same).

With respect to the first element (minimum contacts), the extent of a nonresident defendant's contacts with the forum state may give rise to either "general" or "specific" jurisdiction. *See, e.g., Andy's Music, Inc., supra,* 607 F.Supp.2d at 1287 ("As this court has stated elsewhere, '[j]urisdiction may be either general or specific,' with general jurisdiction applying where a defendant's activities in the forum state are 'substantial or continuous and systematic, regardless of whether those activities gave rise to the lawsuit' and specific jurisdiction where 'a defendant has had few contacts with the forum state, but those contacts gave rise to the lawsuit.'" (citations omitted)). Because a minimum contacts analysis is "immune to solution by checklist," a nonresident defendant's contacts must be viewed both quantitatively and qualitatively. *Sloss Indus. Corp., supra*, 488 F.3d at 925 (internal quotations and citation omitted).

General jurisdiction applies where a defendant's affiliations/contacts with the forum are so "continuous and systematic" as to render the defendant essentially at home in the forum, regardless of whether those affiliations/contacts actually give rise to the claims at issue. *Daimler AG v. Bauman,* 134 S.Ct. 746, 761, 187 L.Ed.2d 624 (2014); *see also Morgan v. North Mississippi Medical Center, Inc.*, 403 F.Supp.2d 1115, 1119 (S.D. Ala. 2005) ("Under general jurisdiction, there must be a showing of 'continuous and systematic' contacts between the defendant and the forum state even if those contacts are unrelated to the plaintiff's claims."), *aff'd,* 225 Fed.Appx. 828 (11th Cir. 2007), *cert. denied,* 552 U.S. 1098, 128 S.Ct. 888, 169 L.Ed.2d 727 (2008). "The due process requirements for general personal jurisdiction are more

11

stringent than for specific personal jurisdiction, and require a showing of continuous and systematic general business contacts between the defendant and the forum state." *Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1292 (11th Cir. 2000), *cert. denied,* 534 U.S. 827, 122 S.Ct. 68, 151 L.Ed.2d 34 (2001). Conversely, specific jurisdiction "arises out of a party's activities in the forum that are related to the cause of action alleged in the complaint[,]" *id.* at 1291 (citations omitted); *see also PVC Windoors, Inc., supra,* 598 F.3d at 808 ("Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum." (citation and internal quotation marks omitted)), "'the central concern of the inquiry'" being "'the relationship among the defendant, the forum, and the litigation.'" *Daimler, supra,* 134 S.Ct. at 754 (citations omitted); *see also Walden v. Fiore,* 134 S.Ct. 1115, 1121, 188 L.Ed.2d 12 (2014) ("The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on "the relationship among the defendant, the forum, and the litigation."'" (citations omitted)); *cf. Louis Vuitton Malletier, S.A. v. Mosseri,* 736 F.3d 1339, 1355 (11th Cir. 2013) ("In specific jurisdiction cases, we apply the three-part due process test, which examines: (1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant 'purposely availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's law; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'") (citations omitted)).

The minimum contacts requirement is grounded in fairness, with a focus on ensuring that the nonresident defendant should reasonably anticipate being haled into court in the forum State. *See Consolidated Dev. Corp.*, 216 F.3d at 1291. "Where a forum seeks to assert specific personal jurisdiction over a nonresident defendant, due process requires the defendant have 'fair warning'

that a particular activity may subject him to the jurisdiction of a foreign sovereign." *Madara, supra*, 916 F.2d at 1516  (citations and internal footnote omitted). "[T]his 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum [. . .] and the litigation results from alleged injuries that 'arise out of or relate to' those activities[.]" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985) (internal citations omitted); *see also Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958) (noting that a nonresident defendant who purposefully avails himself of the privilege of conducting activities within the forum State "invok[es] the benefits and protections of its laws[]").

The second element for the exercise of personal jurisdiction (fair play and substantial justice) requires the Court's consideration of a number of factors: "(a) the burden on the defendant[;] (b) the forum State's interest in adjudicating the dispute[;] (c) the plaintiff's interest in obtaining convenient and effective relief[;] (d) the interstate judicial system's interest in obtaining the most efficient resolution of controversies[;] and (e) the shared interest of the several States in furthering substantive social policies." *See e.g., McGow v. McCurry*, 412 F.3d 1207, 1216 (11th Cir. 2005) (internal citations omitted), *abrogated on other grounds as recognized in Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.,* 593 F.3d 1249 (11th Cir. 2010); *Molex*, 887 F. Supp. 2d at 1203 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 290–92, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980) and recognizing these same five factors)).

A.    **Axelrod's Contacts with This Forum.**

i.    **General Jurisdiction.**

The undersigned readily acknowledges that "[s]ince *International Shoe*, 'specific jurisdiction has become the centerpiece of modern jurisdiction theory, while general jurisdiction [has played] a reduced role.'" *Daimler AG,* 134 S.Ct. at 755, quoting *Goodyear,* 564 U.S. at ___, 131 S.Ct. at 2854; *see also id.* at 758 ("As this Court has increasingly trained on the 'relationship among the defendant, the forum, and the litigation,' *Shaffer,* 433 U.S. at 204, 97 S.Ct. at 2569, *i.e.,* specific jurisdiction, general jurisdiction has come to occupy a less dominant place in the contemporary scheme." (footnotes omitted)). Moreover, it is clear that general jurisdiction applies where a defendant's affiliations/contacts with the forum are so "continuous and systematic" as to render the defendant essentially at home in the forum, regardless of whether those affiliations/contacts actually give rise to the claims at issue. *Daimler, supra,* 134 S.Ct. at 761. And while "[f]or an individual, the paradigm forum for the exercise of general personal jurisdiction is the individual's domicile[,]" *Goodyear Dunlap Tire Operations, S.A. v. Brown,* 564 U.S. 915, 924, 131 S.Ct. 2846, 2853, 180 L.Ed.2d 796 (2011), this does not dictate that general jurisdiction is "out" simply because Axelrod is not domiciled in Alabama (*see* Doc. 13, Axelrod Dec., at ¶ 10 ("I am domiciled in San Diego County, California.")), *but cf. Baker v. Kinsey,* 2016 WL 3924222, *1 (N.D. Ala. Jul. 21, 2016) ("Since everyone agrees Kinsey is not an Alabama domiciliary . . ., general jurisdiction is out."), because the general jurisdiction cases recently decided by the Supreme Court of the United States addressed corporations and business entities in general, *compare Daimler, supra,* 134 S.Ct. 746 (discussing general jurisdiction over foreign corporation) *with BNSF Railway Co. v. Tyrrell,* 137 S.Ct. 1549 (2017) (discussing general jurisdiction over a railroad) and had no occasion to address an "exceptional case" in

which general jurisdiction would be proper in a forum State that is not an individual defendant's domicile, *cf. Daimler,* 134 S.Ct. at 761 n.19 (refusing to "foreclose the possibility that in an exceptional case . . ., a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State[,]" but also finding no occasion to explore that question); *id.* at 760 ("*Goodyear* did not hold that a corporation may be subject to general jurisdiction *only* in a forum where it is incorporated or has its principal place of business; it simply typed those places paradigm all-purpose forums.").[5] Therefore, this Court must examine the unique facts of this case and determine whether Axelrod's individual contacts/affiliations with Alabama are "so continuous and systematic" as to render him essentially at home in the forum, *see Kason Industries, Inc. v. Dent Design Hardware, Ltd.,* 952 F.Supp.2d 1334, 1339-40 (N.D. Ga. 2013) (noting that a court must look at the facts of each case to determine whether a defendant's activities/contact/affiliations within a forum are continuous and systematic), such that this Court may exercise general personal jurisdiction over him.

The Defendant, Barry Axelrod, who has largely made his living as an agent to professional athletes and entertainers (Doc. 13, Axelrod Dec., at & 2) is, by his own admission, no stranger to Alabama. During the 1990s, Axelrod traveled to Alabama on a number of occasions to participate in an annual charity softball tournament event with one of his clients, Mark Harmon, and his long-time friend, Bill Shanahan, a resident of Mobile and the general

---

[5] This is really no surprise given the dearth of general jurisdiction cases. *See, e.g., Goodyear, supra,* 564 U.S. at 924 & 925, 131 S.Ct. at 2854 (observing that since *International Shoe,* the Supreme Court's decisions have primarily focused on the circumstances warranting the exercise of specific jurisdiction, there being only two cases postdating *International Shoes* that tackled general jurisdiction, namely, *Perkins v. Benguet Consol. Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952) and *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). And since *Goodyear*, the Supreme Court, as referenced earlier, has never addressed the question of when an individual nonresident defendant's contacts with a forum state are so systematic and continuous as to render the individual at home in a forum that is not his domicile.

manager for the Mobile BayBears minor league baseball team. (Doc. 13, Axelrod Dec., at ¶ 13; *see also* Doc. 22, Exhibit C (newspaper article quoting Axelrod that the charity softball tournament was played in Mobile, Alabama for 10 years)). And, in 2003, Axelrod, as an individual offering to provide professional services, initially contracted with Peavy—who has always maintained his homestead in Alabama, voted in Alabama, and maintained an Alabama driver's license (Doc. 22, Peavy Dec., at ¶ 2)—to represent him as his player agent (*see* Doc. 22, Exhibit A-1 to Peavy Dec.). In the Representation Agreement, Axelrod also offered to provide additional services to Peavy (*see id.*), which he discussed in more detail with Peavy during his trip to visit Peavy in Mobile, Alabama, in late 2003 or early 2004 (Doc. 22, Peavy Dec., at ¶ 6).

At the onset of their relationship, the primary thread connecting Axelrod and Peavy was baseball and the negotiation of a favorable baseball contract with a MLB team; therefore, although Axelrod certainly promoted additional services that he could perform for Peavy, in late 2003 or early 2004, he did not initially provide those other financial and business management services to Peavy. (Doc. 13, Axelrod Dec., at ¶ 28.)[6]  It was a few years later, in 2005 or 2006 and pursuant to an oral agreement, after Peavy's baseball career began to "take off" and his family grew, that Axelrod began providing Financial Management Services to Peavy. (*Compare id.* at ¶¶ 5 & 7 ("He began performing services for me in Alabama that he had previously advertised to me in the Representation Agreement, such as depositing my paycheck into my bank account and writing checks to pay bills for my family and me including car payments, insurance, utilities, cable providers, cell phones, and school tuition for my children[.]") *with* Doc. 13, Axelrod Dec., at ¶¶ 23, 36, 38 & 40). By Axelrod's own admission, the agreement for Axelrod to provide such services actually occurred in 2005 or no later than 2006 (*Compare* Doc. 13, Axelrod Dec., at ¶ 36 (in 2005, Axelrod began preparing monthly financial statements to Peavy)

---

[6] There has never been any suggestion that Axelrod did not represent Peavy properly as a player agent.

*with id.* at ¶ 40 (provision of business management services began in 2006); *see* Doc. 22, Peavy Dec., at ¶ 7), which was, of course, <u>after</u> he made a trip to Alabama in late 2003 or early 2004 to visit Peavy and to promote those services (*see* Doc. 22, Peavy Dec., at ¶ 6). *See Leithead v. Banyan Corp.*, 926 So. 2d 1025, 1027 (Ala. 2005) (Alabama Supreme Court exercised general personal jurisdiction over the nonresident defendant corporation where, *inter alia*, there was a written employment contract between the parties governing the plaintiff's compensation package and rights pertaining to stock options).

Again, these services included providing his Alabama-based client with annual budgets (to govern spending and savings) and paying the bills generated by the Peavy family in Alabama (utilities, cell phones, car payments, insurance, school tuition and the like). Axelrod thereby created continuous contacts, as opposed to mere fortuitous occurrences, with Alabama. And, in furtherance of his presence in Alabama, Axelrod prepared invoices for professional services rendered and addressed those invoices to Peavy's residence in Alabama. (Doc. 22, Peavy Dec., at ¶ 14). Axelrod benefitted from significant revenue from an Alabama-based client. Axelrod also sent monthly financial statements detailing purported net worth to Peavy in Mobile. (*see id.* at ¶ 6). *See Leithead, supra,* 926 So. 2d at 1031 (recognizing that although the use of interstate facilities, such as the telephone and mail, cannot *alone* provide the requisite "minimum contacts" for due process, such contacts can be considered to determine whether a party has subjected itself to general jurisdiction of the courts of this State).

Peavy's reliance on Axelrod continued to grow and, as a result, Axelrod's affiliations with Alabama continued to grow. Beginning in 2008, Axelrod actively participated in the acquisition and management of Peavy's real property investments in Alabama. (Doc. 22, Peavy Dec., at ¶ 17 ("In or around 2008, Axelrod began to assist me with purchases of real property

near Catherine, Alabama, which became known as 'Southern Falls" and was owned by Southern Falls Plantation, LLC, an entity owed by me.")). To this end, Axelrod dealt directly with Peavy's real estate broker in Alabama, Darren McGilberry with South Land, LLC, "to acquire parcels of land in a series of transactions[,]" that began in 2008 and ended in 2013 or 2014 with purchase of the last parcel of the Southern Falls property. (*Id.*). Indeed, "Axelrod arranged for a title opinion and title insurance to be paid on the Southern Falls property[]" and arranged for Peavy to sign the purchase and sale agreement." (*Id.*) In addition, Axelrod also managed the payroll for Peavy's business ventures and his charitable foundation in Alabama. (Doc. 22, Peavy Dec., at ¶ 18 ("Axelrod obtained all necessary insurance for Southern Falls, added and removed employees from the payroll, participated in the operations and management of the property, and created and oversaw the budget for the property.")). With respect to the Southern Falls Property, which is owned by an Alabama LLC, Southern Falls Plantation LLC, Axelrod served as Peavy's agent and assisted Peavy's brother, Luke, "in insuring the property, operating the property, arranging for the payment of utilities and expenses associated with the property, and overseeing payroll related to Southern Falls[]" (Doc. 22, L. Peavy Dec., at ¶ 6; *cf.* Doc. 13, Axelrod Dec., at ¶ 122 (Defendant's admission that he continued to assist with payroll taxes, insurance, etc. through sometime in 2016)), communicating with Alabama-based Luke Peavy primarily by email, as necessary (Doc. 22, L. Peavy Dec., at ¶¶ 5-6).

Of further particular significance, as noted by Peavy (Doc. 22, Peavy Dec., at ¶ 18), Axelrod had authority to hire and fire individuals associated with an Alabama business entity, Southern Falls Plantation, LLC. And, importantly, Axelrod was an Officer and Director of The Jake Peavy Foundation until his August 15, 2016 resignation, notice of which was mailed to the Foundation in Mobile, Alabama (Doc. 22, Exh. A-9 to Peavy Dec.). Axelrod communicated by

phone with Joan Dunlap, an employee of the Foundation, regarding a hiring decision in 2016 (Doc. 13, Axelrod Dec., at ¶ 115).

Axelrod also rendered legal services to and on behalf of Peavy with respect to the creation of Alabama trusts, serving as a Successor Trustee to a Peavy trust governed by Alabama law, and managing and resolving a lawsuit filed against Peavy in Alabama. (Doc. 22, Peavy Dec., at ¶¶ 9, 11 & 21.) On May 13, 2008, Peavy created the Jacob E. Peavy Revocable Trust, governed by the laws of the State of Alabama, "to manage investments" for the Peavys and therein named Axelrod as successor Trustee. (*Id.* at ¶ 9 *cf.* Doc. 13, Axelrod Dec., at ¶ 54 ("In or around February of 2008 Mr. Peavy created the Jacob E. Peavy Revocable Trust [] for estate planning purposes.")). And "[i]n May 2012, the Jacob E. Peavy and Katie L. Peavy Irrevocable Life Insurance Trust was created pursuant to the laws of Alabama[,]" with Peavy and his wife, Katie, serving as the grantors and appointing Axelrod to serve as the trustee, an appointment Axelrod voluntarily accepted and acknowledged with his signature. (*Id.* at ¶ 11). In or around 2013, Axelrod provided Peavy with legal advice "with respect to a lawsuit filed against [Peavy] in Alabama in 2013 by Kirby Spectrum Collision Inc. d/b/a Spectrum Collision." (*Id.* at ¶ 21). Indeed, Peavy's "Alabama attorneys with the law firm Fleming & Chavers reported to Axelrod and Axelrod had authority to direct them in managing and resolving the matter." (*Id.*). And, finally, Axelrod traveled to Alabama in November 2010 to attend the wedding of Peavy's brother, Luke (Doc. 13, Axelrod Dec., at ¶ 93), and during the trip Axelrod met with Peavy to discuss general business matters (Doc. 22, Peavy Dec., at ¶ 10).

The undersigned finds that the affiliations listed above demonstrate how Axelrod has purposefully and consistently had his hand and footprints all over the forum, safely placing him "at home" in Alabama. Stated differently, the foregoing facts confirm that Axelrod has

maintained substantial or continuous and systematic contacts with the State sufficient to justify this Court's exercise of general personal jurisdiction over him.

### ii.    **Specific Jurisdiction.**

When a plaintiff stakes the position that specific personal jurisdiction may be exercised over a nonresident defendant, courts apply a three-part due process test "which examines: (1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant 'purposely availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's law; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Louis Vuitton, supra,* 736 F.3d at 1355 (citations omitted); *see also Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County,* 2017 WL 2621322, *13 (Jun. 19, 2017) (Sotomayor, J., dissenting) ("Our cases have set out three conditions for the exercise of specific jurisdiction over a nonresident defendant. . . . First, the defendant must have '"purposefully avail[ed] itself of the privilege of conducting activities within the forum State"' or have purposefully directed its conduct into the forum State. . . . Second, the plaintiff's claim must 'arise out of or relate to' the defendant's forum conduct. . . . Finally, the exercise of jurisdiction must be reasonable under the circumstances."). Because "[t]he plaintiff bears the burden of establishing the first two prongs, and if the plaintiff does so, 'a defendant must make a "compelling case" that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice[,]'" *Louis Vuitton,* 736 F.3d at 1355, quoting *Diamond Crystal Brands, supra,* 593 F.3d at 1267, the undersigned directs attention to the first two prongs in this section of the opinion.

To determine whether the Plaintiffs' claims arise out of or relate to at least one of the Defendant's contacts with the forum, this Court's inquiry "'must focus on the direct causal relationship between the defendant, the forum, and the litigation.'" *Id.* at 1355-56, quoting *Fraser v. Smith,* 594 F.3d 842, 850 (11th Cir. 2010), omitting internal quotation marks but in turn quoting *Helicopteros, supra,* 466 U.S. at 414, 104 S.Ct. at 1872. Here, the undersigned finds that Plaintiffs' breach of contract, breach of fiduciary duties, and fraudulent concealment claims arise out of Axelrod's contacts with Alabama. Plaintiffs allege that Axelrod, by failing to notify them of unbudgeted and unapproved wire transfers of millions of dollars of their funds, fraudulently concealed material information, breached the contract to render Financial Management Services, and breached his fiduciary duties. (*See generally* Doc. 1, COMPLAINT.) There is evidence that, pursuant to the agreement to perform Financial Management Services, Axelrod undertook an obligation to review and report to Peavy on financial activities. Axelrod's acts in complying or failing to comply with his obligations were directed toward Alabama, where the Peavys were residents at all relevant times. In particular, Axelrod had two key meetings with Peavy in Alabama, in 2013 and early 2016, regarding the state of his financial affairs, and the Peavys allege that it was during the course of these two meetings that Axelrod failed to disclose the misappropriation of their assets. Accordingly, there is a direct causal relationship between Axelrod, Alabama, and the Plaintiffs' claims.

With respect to the second prong of purposeful availment, the undersigned returns to *Louis Vuitton,* a case in which the Eleventh Circuit recognized that "[u]nder the minimum contacts test for purposeful availment, we assess the nonresident defendant's contacts with the forum state and ask whether those contacts: (1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed himself of the privileges of doing

business within the forum; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum." *Id.* at 1357 (citation omitted).

Here, the undersigned concludes that Axelrod purposely availed himself of this forum in a manner that he could reasonably anticipate being haled into an Alabama court. Axelrod availed himself of the privilege of conducting activities in Alabama when he maintained a long-term contractual relationship with Peavy, who he knew to be an Alabama resident; traveled to Alabama to meet with Peavy on numerous occasions; communicated with Peavy's Alabama-based consultants by telephone and email regarding the Peavys' finances and investments; and mailed invoices and financial statements to Peavy in Alabama.

When a party reaches out beyond one state and creates a continuous relationship and obligations with a citizen of another state—as Axelrod did in this case—he is "subject to regulation and sanctions in the other State for the consequences of [his] activities." *Burger King*, 471 U.S. at 473, 105 S.Ct. at 2182 (internal quotations and citations omitted) (exercising personal jurisdiction over nonresident franchisee who contracted with a Florida corporation and performed under that contract for a number of years); *see also Walden, supra,* 134 S.Ct. at 1122 ("[W]e have upheld the assertion of jurisdiction over defendants who have purposefully 'reach[ed] out beyond' their State and into another by, for example, entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State, or by circulating magazines to 'deliberately exploit[t]' a market in the forum State[.]" (citations omitted)); *Baker v. Bennett*, 603 So.2d 928, 934 (Ala. 1992) (exercising personal jurisdiction over nonresident defendant who made contacts with Alabama in his position as an agent acting on behalf of a foreign entity), *overruled on other grounds by State Farm Fire & Cas. Co. v. Owen*, 729 So.2d 834 (Ala. 1998). Axelrod specifically promoted the additional financial

services he could provide to Peavy during a trip to Alabama a few years before the two reached

an oral agreement for the provision of those services, services the Defendant knew would require

wide-reaching contacts in Alabama[7], such as the payment of bills, generation of annual budgets

for his Alabama-based client and his family to govern spending and savings, and the like, in

exchange for payment of the services rendered by lifelong Alabama residents (*compare* Doc. 22,

Peavy Dec., at ¶ 14 *with* Doc. 13, Axelrod Dec., at ¶ 103 (establishing that Axelrod sent invoices

to Peavy's address in Catherine, Alabama, and received payment from Peavy for those

services)). *Cf. Ex parte Paul Maclean Land Servs., Inc.*, 613 So.2d 1284, 1287–88 (Ala. 1993)

(recognizing that a nonresident defendant's submission of fraudulent invoices to Alabama that

are to be paid by an Alabama resident supports the exercise of personal jurisdiction over him).

Ultimately, of course, Axelrod's provision of financial management services extended beyond

just Peavy and his family to include Peavy's business ventures—in particular, Southern Falls

Plantation, LLC—and Peavy's charitable foundation in Alabama (Doc. 22, Peavy Dec., at ¶ 18),

which led to Axelrod's numerous communications with Peavy's Alabama-based consultants by

telephone and email regarding the Peavys' finances and investments (*see* Doc. 22, L. Peavy

Dec., at ¶¶ 5-6; *id.,* Peavy Dec., at ¶ 23).

Axelrod's numerous business trips to Alabama to meet with Peavy confirm this Court's

recommendation to exercise personal jurisdiction over Axelrod. While physical presence is not

essential to the exercise of personal jurisdiction over a nonresident defendant, *see, e.g., Burger

King*, 471 U.S. at 479, 105 S.Ct. at 2186; *Leventhal v. Harrelson*, 723 So.2d 566, 569 (Ala.

1998), here, Axelrod physically traveled to the State on at least four occasions to visit Peavy with

---

[7] Thus, the undersigned simply cannot agree with any suggestion by Axelrod that a finding of purposeful availment is foreclosed because his conduct was targeted at the plaintiffs, not Alabama. *See MAG IAS Holdings, Inc. v. Schmuckle,* 854 F.3d 894, 901 (6th Cir. 2017) ("It would severely limit the availability of personal jurisdiction if every defendant could simply frame his conduct as targeting only the plaintiffs and not the forum state.").

regard to his financial management services (Doc. 13, Axelrod Dec. at ¶¶ 31, 93, 106, 114; Doc. 22-1, Peavy Dec. at ¶¶ 6, 10, 13, 22). *See Walden, supra,* 134 S.Ct. at 1123 ("To be sure, a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties."); *cf. Schmuckle, supra.* And, in particular, Axelrod made two of those visits (in 2013 and again in 2016) after he had been receiving statements from Narayan showing numerous wire transfers of millions of dollars to TTR.  Even so, Axelrod failed to inform Peavy of these transfers during their discussions of Peavy's financial condition and, indeed, it is alleged he knowingly concealed this relevant information. *See Bronner v. Duggan,* 2017 WL 1208402, *9 (D.D.C. Mar. 31, 2017) (exercising specific personal jurisdiction where "the allegedly injurious acts occurred at a meeting in the District of Columbia and Individual Defendants voluntarily assumed leadership roles in the District of Columbia organization they allegedly injured[.]"). Whether Axelrod's visits to Alabama were at Peavy's request or of his own initiative is of minimal relevancy; "'who started it' is just one factor to consider in determining whether the defendant is subject to personal jurisdiction." *Leventhal*, 723 So. 2d at 570.  Similarly, the fact that Axelrod did not maintain an office in Alabama or solicit clients in Alabama is irrelevant, as "those types of direct contacts are not necessary to satisfy constitutional concerns." *Molex Co., LLC*, 887 F. Supp. 2d at 1202 (citation omitted).

Due to the nature of Axelrod's activities, Axelrod had "fair warning" that the acts or omissions forming the basis of Plaintiffs' claims would impact an Alabama resident, such that he should reasonably anticipate being haled into court in this State. Thus, the minimum contacts requirement is satisfied so as to permit this Court's exercise of specific personal jurisdiction over Axelrod.

B.     **Notions of Fair Play and Substantial Justice.**

Having found sufficient minimum contacts by Axelrod with this forum, the Court turns to the second consideration—whether the exercise of personal jurisdiction over Axelrod, a nonresident defendant, offends traditional notions of fair play and substantial justice. *See Vermeulen, supra*, 975 F.2d at 754.   This determination requires the Court to consider five factors:

(i)      the burden on the defendant;

(ii)     the forum State's interest in adjudicating the dispute;

(iii)    the plaintiff's interest in obtaining convenient and effective relief;

(iv)     the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and

(v)      the shared interest of the several states in furthering substantive social policies.

*See, e.g., Molex Co., LLC*, 887 F. Supp. 2d at 1203, citing *World-Wide Volkswagen*, 444 U.S. at 292, 100 S.Ct. at 564. "'[W]here a defendant who purposely has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Id.,* quoting *Burger King Corp.,* 471 U.S. at 477, 105 S.Ct. at  2184-85.

With respect to the first factor, it is clear that Axelrod will not be significantly burdened by defending Plaintiffs' suit in Alabama. This is particularly true given Axelrod's own admission that he traveled to Alabama voluntarily on an annual basis for a 10-year period in the 1990s, and that he also traveled to Alabama on at least four occasions to visit with Peavy. (Doc. 13, Axelrod Dec., at ¶¶ 13, 31, 93, 106 & 114.) The Court's conclusion on this factor is furthered by the reality that "modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." *McGee v.*

25

*International Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957); *see also Robinson v. Giarmarco & Bill, P.C.,* 74 F.3d 253, 259 (11th Cir. 1996) ("The burden on the defendants occasioned by litigating outside Michigan is not slight, but modern methods of transportation and communication reduce this burden significantly."). In short, although Axelrod resides in California, he has traveled to Alabama on numerous occasions; therefore, the undersigned finds that Axelrod will not be significantly burdened by having to defend this action in Alabama.

Second, Alabama has significant interests in adjudicating this lawsuit, which involves its residents who allege that they were injured in the forum State as a result of the defendant's actions and omissions. "Alabama has an interest in providing a forum to its residents for the adjudication of disputes occurring within its borders[.]" *Ex parte MONY Fed. Credit Union*, 668 So.2d 552, 560 (Ala. 1995); *cf. Mutual Serv. Ins. Co., supra,* 358 F.3d at 1320 ("Alabama has a strong interest in the litigation because the suit involves the failure of a foreign insurer to pay claims due under policies issued to an Alabama corporation."). Because the Peavys are Alabama residents who have always maintained their homestead in Alabama (Doc. 22, Peavy Dec. at ¶ 2), Alabama (and this Court sitting in Alabama) certainly has an interest in deciding this dispute, which involves the loss of millions of dollars by its residents, a loss which, under the allegations of the Complaint, could have been prevented by the Defendant in the proper performance of his fiduciary duties. This same rationale applies to the third factor to be considered—Plaintiffs' interest in obtaining convenient and effective relief.

Fourth, the interstate judicial interest in obtaining the most efficient resolution of controversies supports this Court's exercise of personal jurisdiction over Axelrod. Although many of the witnesses and evidence relevant to Plaintiffs' claims allegedly are in both Alabama

and California (*see* Doc. 13, Axelrod Dec., at ¶¶ 138-144; Doc. 22, Peavy Dec., at ¶¶ 27-39), *see*

*Andersen v. Sportmart, Inc.,* 57 F.Supp.2d 651, 663 (N.D. Ind. 1999) ("In evaluating [the

efficient administration of justice] factor, courts generally consider where witnesses and

evidence are likely to be located."), the evidence shows that Axelrod has made multiple trips to

Alabama. Witnesses in California may provide testimony about what Axelrod knew about the

activities of Narayan and when he knew about such activities; however, witnesses residing in

Alabama, who attended meetings with Axelrod, Narayan, and Peavy in Alabama, are privy to

Axelrod's actions related to his discussions with and disclosures (or omissions) to Peavy.

Accordingly, the Court finds it more efficient to resolve this case in Alabama.

Finally, allowing this case to proceed in this Court will further Alabama's "interest in

'providing an effective means of recovery for a resident who has been damaged[,]'" *Leithead,*

*supra,* 926 So.2d at 1032, quoting *Shrout v. Thorsen,* 470 So.2d 1222, 1225 (Ala. 1985); *see also*

*Berlin v. Newman,* 657 So. 2d 890, 892 (Ala.Civ.App. 1994) (recognizing Alabama's interest in

providing an effective means of recovery for a resident who has been damaged by the fraudulent

acts of a nonresident), *cert. denied sub nom. Ex parte Snider,* 657 So.2d 894 (Ala. 1995), as the

Plaintiffs' lawsuit is based on their allegations that Axelrod breached his fiduciary duties,

breached his contract, and engaged in fraudulent concealment.

Consideration of the five factors therefore leads the undersigned to recommend that the

Court conclude that exercising personal jurisdiction over Axelrod would not be unreasonable or

inconsistent with notions of fair play and substantial justice.

## II.    Motion to Transfer Venue Pursuant to 28 U.S.C. §§ 1406(a) & 1631.

### A.    28 U.S.C. § 1406(a).

Section 1406(a) provides: "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). In other words, a prerequisite to invoking §1406(a) is that the venue chosen by the plaintiff must be improper. *See id.*; *see also Goodwyn, Mills & Cawood, Inc. v. Black Swamp, Inc.*, 956 F.Supp.2d 1323, 1326 (M.D. Ala. 2012). It is not enough to merit a transfer that venue might be proper both in this district and in the defendant's desired transferee district. *See Goodwyn*, 956 F. Supp. 2d at 1326. "[I]n ruling on a motion under § 1406(a), the court is not required to weigh the events that occurred in [the desired transferee state] against those that took place in Alabama and choose which venue is more proper; rather, even though 'a substantial part of the events or omissions giving rise to' the claim in this litigation may have occurred in [the desired transferee state], so long as the same can be said as to . . . Alabama, venue is proper in this district." *Id.* Indeed, the plain language of the general federal venue statute—28 U.S.C. § 1391—expressly contemplates some cases in which venue will be proper in two or more districts. *Id.* (citation omitted).

Here, the undersigned concludes, *infra* Section III(A), that Plaintiffs' venue choice was correct, as a "substantial part of the events or omissions giving rise to the claim[s]" occurred in the Southern District of Alabama, *see* 28 U.S.C. § 1391(b)(2) ("A civil action may be brought in . . . a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . ."). Because the Peavys' claims against Axelrod center on his acts or omissions relating to his rendition of the Financial Management Services (particularly during the

28

period of 2011 through 2016) for and on behalf of the Peavys, who are Alabama residents, a "substantial part of the events or omissions giving rise to the claim[s]" occurred in this forum, and thus their choice of venue is correct. 28 U.S.C. § 1391(b)(2). Accordingly, § 1406(a) is inapplicable.

### B.      28 U.S.C. § 1631.

"Whenever a civil action is filed in a court . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action . . . to any other such court in which the action . . . could have been brought at the time it was filed[.]" 28 U.S.C. § 1631. Just as with Section 1406(a), a prerequisite to a transfer under Section 1631 is a finding that the court in which the lawsuit was filed lacks jurisdiction. *See id.* Here, because this Court has found that it has personal jurisdiction over Axelrod, § 1631 is not implicated; therefore, the Court rejects Axelrod's argument premised on this statute.

### III.      Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a).

As an alternative to dismissal, Axelrod moves to transfer this action to the Southern District of California, where he resides, in accordance with 28 U.S.C. § 1404(a). (Doc. 14). Section 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court ***may*** transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." *Id.* (emphasis supplied). The statute is intended "to place discretion in the district courts to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Org., Inc. v. Rioch Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 2244, 101 L.Ed.2d 22 (1988), quoting *Van Dusen v. Barrack,* 376 U.S. 612, 622, 84 S.Ct. 805, 812, 11 L.Ed.2d 945 (1964); *see also Carroll v. Texas Instruments, Inc.,* 910 F.Supp.2d 1331,

1333 (M.D. Ala. 2012) ("A district court has broad discretion in weighing the conflicting arguments as to venue, but must engage in an individualized, case-by-case consideration of convenience and fairness." (quotation marks and citations omitted)). "[I]n the usual motion for transfer under section 1404(a), [as here,] the burden is on the movant to establish that the suggested forum is more convenient." *In re Rioch Corp.*, 870 F.2d 570, 573 (11th Cir. 1989); *see also Holmes v. Freightliner, LLC*, 237 F.Supp.2d 690, 692-93 (M.D. Ala. 2002) (plaintiff's selected forum is presumptively correct, and defendant bears burden of demonstrating that suggested forum is more convenient).

District Courts are accorded broad discretion in weighing whether to transfer an action under § 1404(a). *England v. ITT Thompson Indus., Inc.*, 856 F.2d 1518, 1520 (11th Cir. 1988). Relevant factors include: "(1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances." *Manuel v. Convergys Corp.,* 430 F.3d 1132, 1135 n.1 (11th Cir. 2005) (citation omitted); *see also Gould v. Nat'l Life Ins. Co.,* 990 F.Supp. 1354, 1357-58 (M.D. Ala. 1998) (when deciding whether to transfer venue, "courts generally rely on a number of factors including: (1) the plaintiff['s] choice of forum; (2) the convenience of the parties; (3) the convenience of the witnesses, and the availability of witnesses through compulsory process; (4) the location of documents and other sources of proof; (5) the relative ability of the parties to bear the expense of changing the forum; and (6) trial efficiency and expense to the justice system."); *see Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–09, 67

S.Ct. 839, 843, 91 L.Ed. 1055 (1947) (decided before enactment of § 1404 but noting numerous relevant factors and observing that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."), *superseded on other grounds by statute as stated in American Dredging Co. v. Miller*, 510 U.S. 443, 114 S. Ct. 981, 127 L. Ed. 2d 285 (1994).

### A.    Venue is Proper in Both Districts.

The undersigned first considers whether venue is properly laid in either or both districts. *See Carroll, supra,* 910 F.Supp.2d at 1333 ("In resolving a § 1404(a) motion, the court first determines whether the action could have originally been brought in the proposed district of transfer[.]"). Pursuant to 28 U.S.C. § 1391(a), venue in a civil case in which jurisdiction is predicated solely on diversity of citizenship, as here, is proper in any of the following judicial districts: "(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." 28 U.S.C. § 1391(a).  The venue statute "contemplates some cases in which venue will be proper in two or more districts." *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003).

As alleged in the complaint, a substantial part of the events giving rise to the claims in this case arose in the Southern District of Alabama. Axelrod visited Peavy in Mobile in late 2003 or early 2004 to further discuss the additional services he could provide to the Peavys relating to investments and finances. (Doc. 22, Peavy Dec., at ¶ 6; *see* Doc. 13, Axelrod Dec. at ¶ 31.)

31

Axelrod also attended Luke Peavy's wedding in 2010, where he discussed business and financial matters with Peavy.  (Doc. 22, Peavy Dec., at ¶ 10; Doc. 22, L. Peavy Dec. at ¶ 3; *see* Doc. 13, Axelrod Dec., at ¶ 93.) More importantly, Axelrod had two key meetings with Peavy in this District, in 2013 and early 2016, regarding the state of his financial affairs. The Peavys allege that it was during the course of these two meetings that Axelrod failed to disclose the misappropriation of their assets. (*Compare* Doc. 1, COMPLAINT, at ¶¶ 18-24; Doc. 22, Peavy Dec., at ¶¶ 13 & 22; and Doc. 22, L. Peavy Dec., at ¶¶ 7-8 *with* Doc. 13, Axelrod Dec., at ¶¶ 106 & 114.) Indeed, after the meeting in early 2016, Axelrod telephoned Joan Dunlap in Alabama regarding the Peavys' investments, finances, and charitable foundations. (Doc. 13, Axelrod Dec., at ¶ 115; Doc. 22, Peavy Dec., at ¶¶ 19 & 23.)[8] These events give rise to Plaintiffs' claims for purposes of § 1391(a), and therefore venue is properly laid in this District.

Likewise, venue would be properly laid in the Southern District of California because part of the events giving rise to the claims in this case occurred in that District as well.  Axelrod based his business operations in an office in the Southern District of California for at least part of the relevant period.  (*See* Doc. 13, Axelrod Dec. at ¶¶ 4, 20 & 23.)

Because venue is proper in both districts, the undersigned will consider the 1404(a) factors as enumerated in *Manuel* to determine whether this action should be transferred to the Southern District of California for convenience.

**B.**     **Section 1404(a) Factors.**

      **i.**     **Plaintiff's Choice of Forum.**

---

[8]     In addition, in general Axelrod communicated with Luke Peavy about the Peavys' investment, financial and charitable foundations by email.  (Doc. 22, L. Peavy Dec., at ¶¶ 4-6). The Defendant communicated by telephone and email with Peavy while Peavy was located in Alabama, forwarded regular mail to Peavy in Alabama, and paid bills on services provided to the Peavys in Alabama. (*Compare* Doc. 22, Peavy Dec, at ¶¶ 14, 16 & 20 *with* Doc. 13, Axelrod Dec., at ¶ 36.)

Under § 1404(a), a "'plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations.'" *Robinson, supra,* 74 F.3d at 260, quoting *Howell v. Tanner,* 650 F.2d 610, 616 (5th Cir. Unit B 1981); *Bartronics, Inc. v. Power-One, Inc.*, 510 F.Supp.2d 634, 637 (S.D. Ala 2007) ("[A] plaintiff's choice of forum should be honored so long as venue is proper there, unless substantial countervailing considerations militate to the contrary."). A plaintiff's choice of forum is not clearly outweighed where transfer would merely shift inconvenience from the defendant to the plaintiff. *See Robinson*, 74 F.3d at 260 ("The district court found that transferring the case to Michigan would merely shift inconvenience from the defendants to the plaintiff, implying that the plaintiff's choice of forum was not outweighed by other factors. We see no abuse of discretion in that decision.").

Axelrod argues that a plaintiff's choice of forum is entitled to less deference under § 1404(a) than it was under the former *forum non conveniens* standard before the enactment of Section 1404. Although the undersigned acknowledges that § 1404(a) provides the court with more flexibility to transfer the action than the common law *forum non conveniens* doctrine, which operates to dismiss an action, a plaintiff's choice of forum is still accorded considerable weight. *Robinson*, 74 F.3d at 260; *Bartronics*, 510 F. Supp. 2d at 637; *Holmes*, 237 F. Supp. 2d at 692-93. As set forth by Judge Steele in *Bartronics*, "[t]his principle has been echoed by myriad district courts examining § 1404(a) motions." *Bartronics*, 510 F. Supp. 2d at 637 n.4 (citing cases).

Moreover, the fact that this case was removed to district court from the Circuit Court of Mobile County does not diminish the importance of the Plaintiffs' choice to litigate in Alabama rather than in California. "To hold otherwise would be to create the anomalous situation that a plaintiff's geographic choice is entitled to greater deference based on whether or not it sues in

federal court first or whether it has the fortuity of suing a non-diverse defendant in state court."
*First Fin. Bank v. CS Assets, LLC,* 2009 WL 1211360, a*6 (S.D. Ala. May 4, 2009) (considering
whether to move action from southern Alabama to northern Alabama) (citation omitted). "[F]or §
1404(a) purposes[,] a chosen venue encompasses both federal and state courts . . . ." *Superior
Precast Inc. v. Safeco Ins. Co. of America,* 71 F.Supp.2d 438, 446 (E.D. Pa. 1999). By removing
the case to federal court, Axelrod only moved the case five blocks within the City of Mobile;
therefore, the Peavys' geographic choice of forum was not diminished.

It is undisputed that the Peavys are currently located in the Southern District of Alabama
and have chosen to bring suit in their home forum. This factor weighs heavily in favor of
maintaining venue in this District. Unless the balance of the remaining factors is strongly in
favor of the defendant, the Peavys' choice of forum should not be disturbed. *See Robinson,
supra,* 74 F.3d at 260 ("The plaintiff's choice of forum should not be disturbed unless it is
clearly outweighed by other considerations.").

ii.    **Convenience of the Witnesses.**

"[C]ourts have recognized that, aside from the plaintiff's own choice of forum, '[t]he
most important factor in passing on a motion to transfer under § 1404(a) is the convenience of
the witnesses.'" *Bartronics,* 510 F.Supp.2d at 637-38, quoting *Insuracorp, Inc. v. American
Fidelity Assurance Co.,* 914 F.Supp. 504, 506 (M.D. Ala. 1996). The parties have identified
numerous potential witnesses in this case located throughout the United States. (*Compare* Doc.
13, Axelrod Dec., at ¶¶ 128-141 *with* Doc. 22, Peavy Dec., at ¶¶ 26-37.) However, "resolution
of the convenience-of-witnesses issue should not be a battle between the parties of the lengths of
witness lists; the court 'should not merely tally the number of witnesses who reside in the current
forum in comparison to the number located in the proposed transferee forum.'" *Goodwyn, Mills*

& Cawood, Inc., supra, 956 F.Supp.2d at 1328, quoting Neil Bros. Ltd. v. World Wide Lines, Inc., 425 F.Supp.2d 325, 329 (E.D.N.Y. 2006). Instead, this consideration should focus on "a more substantive and qualitative analysis, based on the totality of the circumstances, of the comparative real burdens faced by the parties in gathering, preparing, and presenting their evidence." Id. at 1328–29.

Many of the witnesses identified by Axelrod who are located in California have knowledge about the initial relationship between Axelrod and Peavy, but have little or no knowledge of the actual agreement between Axelrod and Peavy, the Financial Management Services performed by Axelrod, the allegations related to the alleged misappropriation of the Peavys' assets, or Axelrod's alleged failure to disclose critical financial information. For example, the undersigned doubts that Peavy's former player agent, Scott Boras, who was only Peavy's agent for a short time which ended in 2003, would have any relevant testimony to offer about the Financial Management Services Axelrod provided to Peavy from 2005/2006 to 2016. In a similar vein, the Merrill Lynch investment advisors would have little to offer regarding the Financial Management Services provided by Axelrod while Narayan worked for the Peavys as their investment advisor. However, as Axelrod argues, there are notable witnesses located in California (other than Axelrod) who may offer relevant testimony. (Doc. 13, Axelrod Dec., at ¶¶ 128-141). Ash Narayan, who is alleged to have misappropriated the Peavys' funds with Axelrod's knowledge, is the most significant of those witnesses.

Narayan has recently given his deposition testimony in an SEC action filed against him in Dallas, Texas.[9] Former RGT employees Jonathan Endo and Donna Heiken, also located in Orange County, California, may also be material witnesses because they worked with Narayan,

---

[9] In re: RGT Capital Management, Ltd., Cause No. FW-04080-A, in the United States District Court for the Northern District of Texas.

although Axelrod did not offer any record evidence regarding the knowledge and testimony they might provide. The parties also agree that the California accountants Judy Hamilton and Allen Tharp may be witnesses, but the Peavys contend they will be cooperative witnesses in their capacity as the Peavys' former accountants.

The Peavys offer witnesses of their own who are located in or closer to the Southern District of Alabama.  (Doc. 22, Peavy Dec., at ¶¶ 26-37.) In addition to Jake and Katie Peavy, Luke Peavy, Jake Peavy's brother, is a witness who lives in Mobile. (*Id.* at ¶ 28.) Luke Peavy personally communicated with Axelrod regarding the Financial Management Services provided to Peavy and was present at the 2013 and 2016 meetings in Alabama when the Peavys' finances and business ventures were discussed. (*Id.* at ¶¶ 13, 19 & 22; Doc. 22, L. Peavy Dec., at ¶¶ 4-8). Joan Dunlap lives in this District as well (Doc. 22, Peavy Dec., at ¶ 29); she was present at the 2016 meeting and communicated with Axelrod directly about Peavy's business and financial affairs shortly before Peavy discovered the fraudulent transfers (*id.* at ¶ 22). Other local witnesses are bank representative Carey Lancaster, real estate agent Darren McGilberry, and Ben Jernigan. Jernigan is involved in Peavy's local business ventures and was present at the 2016 meeting. (*Id.* at ¶¶ 31-33.). Peavy also identified witnesses not located in this District but in neighboring states—Roy Oswalt in Mississippi, who told Peavy about the TTR loan, and Sarah Allen Lauren in Tennessee, who was present at the 2016 meeting and is the director of the Jake Peavy Foundation. (*Id.* at ¶¶ 30 & 37.) Finally, Marc Griege, managing director of RGT, is located in Dallas, Texas, and is expected to testify about Narayan's management of the Peavys' savings.  (*Id.* at ¶ 34).

The undersigned finds that this factor weighs slightly in favor of the Plaintiffs. As the Peavys allege, the in-person meetings in Alabama involving several Alabama witnesses were key

opportunities for Axelrod to disclose the wire transfers and the TTR loan, and the Peavys, as well as Luke Peavy and Joan Dunlap, were present. Luke Peavy and Dunlap will also provide meaningful testimony regarding their communications with Axelrod in relation to the management of the Peavys' affairs, and Oswalt will testify regarding his communications with Peavy regarding the true nature of the TTR investment. The undersigned has no doubt that Narayan will be a relevant witness regarding the transfers to TTR. Endo and Heiken may be relevant witnesses also. However, the Plaintiffs' witnesses in and around this District, on balance, are at least as significant, if not more significant, than the witnesses located in California, in light of the specific allegations in the complaint. The allegations in the complaint are not grounded upon Axelrod's performance as a sports agent. The allegations instead center on Axelrod's conduct and omissions in the delivery of Financial Management Services. The critical period of time as set forth in the complaint is essentially 2011 forward. This critical period of time is when Axelrod owed the Peavys a fiduciary duty to disclose the fraudulent transfers of money to TTR. Axelrod breached that duty in Alabama by failing to make that disclosure in 2013 and 2016 and, instead, fraudulently concealed Narayan's nefarious activities.

### iii.    Convenience of the Parties.

Both parties desire to litigate this action in their home district and neither side has set forth any unusual or exceptional circumstances; therefore, a transfer would simply shift the convenience from the Plaintiffs to the Defendant. Courts have recognized that "where a transfer merely shifts the inconvenience from one party to another, Plaintiff's choice of forum should remain." *United States v. Contents of Bank of America Acct. No. 9163 in the name of Compu-Cell, including and to $50,000*, 2012 WL 1379783, *4 (S.D. Ala. Apr. 4, 2012) (internal quotations and citation omitted), *report and recommendation adopted,* 2012 WL 1379409 (S.D.

Ala. Apr. 20, 2012); *see DocRX, Inc. v. DOX Consulting, LLC*, 738 F.Supp.2d 1234, 1256 (S.D.

Ala. 2010) ("The convenience of the parties amounts to a wash . . . since it is certainly more

convenient for the plaintiff . . . to pursue this lawsuit in this Court," whereas it is more

convenient for defendants to defend the action . . . where most of the defendants reside.").

Therefore, this factor certainly does not weigh in favor of transfer.

### iv.    Location of Documents and Other Sources of Proof.

Courts have recognized that the importance of this factor has diminished with the

advancement of modern technology and the ease in which documents can be transmitted

electronically. *See Carroll, supra*, 910 F. Supp. 2d at 1339 (M.D. Ala. 2012); *Microspherix LLC

v. Biocompatibles, Inc*., 2012 WL 243764, *3 (S.D. Fla. Jan. 25, 2012) ("In a world with fax

machines, copy machines, email, overnight shipping, and mobile phones that can scan and send

documents, the physical location of documents is irrelevant."). Given the ability to move

documents with relative ease in today's world, the location of documents (and other sources of

proof) does not weigh in favor of transfer to the Southern District of California. As described by

the Peavys, several relevant parties have already produced relevant documents, including

Axelrod and the California accountants. (Doc. 22, Peavy Dec., at ¶¶ 38-39). In addition, RGT,

which is headquartered in Dallas, Texas and no longer has an office in California, has voluntarily

produced relevant documents to the Peavys. (*Id.* at ¶ 39). This factor does not favor transfer.

### v.    Locus of Operative Facts.

"In determining the appropriateness of transfer, a court may also consider where the

operative facts underlying the cause of action transpired." *Johnston v. Foster-Wheeler

Constructors, Inc.*, 158 F.R.D. 496, 504 (M.D. Ala. 1994) (citations omitted). As discussed

above, venue is proper in either district because a substantial part of the events giving rise to the

claims in this case took place in both Alabama and California. Given the allegations in the complaint, the 2013 face-to-face meeting in Catherine, Alabama, the financial reporting in late 2015 and early 2016 for purposes of securing a bank loan in Alabama, and the early 2016 face-to-face meeting in Mobile are critical aspects of the Peavys' claims against Axelrod. These events took place in Alabama. Although Axelrod contends that he and Narayan operated from their home bases in California for the majority of the relevant period,[10] the actions and omissions of Axelrod, as they relate to Narayan's actions relevant to the claims raised in the complaint, center upon the in-person meetings with Peavy in Alabama where Peavy alleges he had a duty to disclose the TTR loan.[11] Accordingly, this factor favors retention of this suit in this District.

### vi.    Availability of Process to Compel Unwilling Witnesses.

As a general matter, transfer under this factor is favored when a transferee court has "absolute subpoena power" (that is, subpoena power for both depositions and trial) over unwilling non-party witnesses. *See In re Hoffmann-La Roche Inc.*, 587 F.3d 1333, 1337–38 (Fed. Cir. 2009); *Southeastern Equip. Co. v. Union Camp Corp.*, 498 F.Supp. 164, 166 (S.D. Ga. 1980) ("Underpinning the decisions which have granted transfer on the basis that another forum would better serve the convenience of witnesses is the principle that trial by live testimony is superior to trial by deposition in resolving factual questions."). However, this factor weighs in

---

[10] Axelrod states in his declaration that at the time Peavy hired Narayan, Narayan worked at RGT's office in Irvine, California (Doc. 13, Axelrod Dec., at ¶ 64) and the Peavys do not dispute that Narayan and Endo are believed to be located there (*see* Doc. 23, at 19).   However, it is unclear whether Narayan worked exclusively from that office during the relevant period and whether he had relevant meetings with Peavy and/or Axelrod in California. What is undisputed is that Narayan attended the 2013 and early 2016 in-person meetings in Alabama with the Peavys that were also attended by Axelrod.  (*Compare* Doc. 13, Axelrod Dec., at ¶¶ 106 & 114 *with* Doc. 22, Peavy Dec., at ¶¶ 13 & 22).

[11] The nature of Axelrod's business as player agent and later as an employee of the Arizona Diamondbacks required him to travel to visit clients and work on the road. That Axelrod and Narayan may be located in California or even elsewhere other than Alabama when they telephoned, e-mailed, or sent mail to Peavy is not as relevant to determination of this factor as are the crucial and pivotal meetings in Alabama  that serve as the basis for Plaintiffs' claims against Axelrod.

favor of maintaining venue when there is no showing that witnesses would be unwilling to appear absent court compulsion, *Dekle v. Global Digital Solutions, Inc.*, 2015 WL 3562412, *5 (S.D. Ala. Jun. 5, 2015), or, even if unwilling witnesses exist, there has been no showing that there are no reasonable accommodations available to secure their trial testimony, *id.* at n.8 (citing numerous cases requiring the movant to show both that key witnesses will not appear voluntarily at trial and that the use of these witnesses' videotaped depositions will not be adequate).

Axelrod argues that it is unlikely Narayan, Endo, and Heiken would voluntarily testify in Mobile, and the use of video depositions in place of live testimony at trial would not be an adequate substitute. Although the undersigned appreciates Axelrod's position regarding the circumstances of those witnesses' departure from RGT, Axelrod offers no more than speculation regarding their availability, or lack thereof, for trial and certainly no more than speculation relative to why the use of their videotaped depositions would not be adequate in this case. In contrast to these three witnesses, most of the material, nonparty witnesses identified by the Peavys bear some relationship to the Peavys, whether as family, agents, employees, accountants, or consultants. The remaining potential witnesses identified by the parties are similarly connected to the parties as employees, service providers, or friends. Therefore, the number of unwilling witnesses in this case, relative to the total number of witnesses, is not substantial and is only speculative at this stage in the litigation. Finally, problems with witnesses being outside the subpoena power would persist with respect to witnesses located in Alabama if the action is transferred to California. *See DocRX, Inc.*, 738 F. Supp. 2d at 1256. Therefore, this factor likewise favors retention.

###### vii.    Relative Means of the Parties.

The parties each have presented evidence that they have the means to litigate this matter in either forum.  Notably, the invoices submitted by Axelrod to Peavy show considerable income to the Peavys from Major League Baseball contracts, as well as significant payments to Axelrod as Peavy's player-agent and financial manager. Therefore, this factor is neutral.

###### viii.    Familiarity with Governing Law.

"[T]he fact that a federal court may apply state law from a different forum is not to be accorded great weight in deciding a motion to transfer, especially where the applicable state law appears to be clear." *Sorrels Steel Co., Inc. v. Great Southwest Corp.*, 651 F.Supp. 623, 630 (S.D. Miss. 1986) (citations omitted). In this case, the Peavys have alleged relatively simple contract and tort claims, and the elements of the breach of contract claim are the same under Alabama or California law. *See Federal Nat'l Mortgage Ass'n v. GNM II, LLC*, 2014 WL 1572584, *2 (M.D. Ala. Apr. 17, 2014) ("Under both Alabama and California contract law, to succeed on a breach of contract claim, a plaintiff must establish the following elements: (1) existence of a valid contract; (2) performance under the contract by a plaintiff; (3) a defendant's breach; and (4) resulting damages." (internal footnote omitted and citations to Alabama and California case law omitted)). In addition, without committing at this time, the undersigned notes that Alabama law may apply to the Peavys' tort claims due to the principle of *lex loci delicti*, which determines the substantive rights of an injured party according to the law of the state where the injury occurred or was sustained. *See, e.g., McSween v. Newmar Corp.*, 2011 WL 5076257, *2 (S.D. Ala. Aug. 26, 2011), *report and recommendation adopted,* 2011 WL 5078086 (S.D. Ala. Oct. 25, 2011). Nevertheless, this Court is well equipped to adjudicate claims of breach of contract, breach of fiduciary duties, and fraudulent concealment by applying either

Alabama or California law. Therefore, the undersigned finds that this factor does not weigh in favor of transfer.

      **ix.**     **Trial Efficiency and Interests of Justice.**

The undersigned notes that both sides have a considerable interest in litigating this matter in their home forum. Although Axelrod is a California attorney, this case is not a matter of local interest in California, given that the Peavys allege damage to their own personal wealth, are located in Alabama, and conduct many of their business and charitable affairs in Alabama. Further, Plaintiffs' claims do not concern Axelrod's rendition of legal services. Axelrod argues that it would conserve judicial resources to avoid litigation and appeal of his motion to dismiss for lack of personal jurisdiction. However, because the undersigned has recommended that the Court find personal jurisdiction over Axelrod in Alabama, that argument is unpersuasive. Moreover, the Eleventh Circuit routinely considers and decides appeals on the issue of personal jurisdiction after entry of a final judgment. The undersigned also notes that Axelrod has retained qualified and competent Alabama counsel in this matter, and has not moved to admit any California attorneys into this court *pro hac vice.*

"Although docket congestion, if proven, may be an appropriate consideration in a § 1404 motion to transfer, case law does not suggest that docket congestion is, by itself, a dispositive factor." *P & S Business Machs., Inc. v. Canon USA, Inc.,* 331 F.3d 804, 808 (11th Cir. 2003) (citations omitted). Plaintiffs presented evidence from U.S. Courts reports to suggest that this District's docket is less congested than the Southern District of California, including that each judgeship in this District has fewer pending cases compared to judgeships in the Southern District of California and that the average time from filing to trial is shorter in this District. Axelrod has not disputed this evidence. The undersigned further expects that the time involved in

a transfer may cause greater delay than retaining the case in this District. *See Trinity Christian Center of Santa Ana, Inc. v. New Frontier Media, Inc.*, 761 F.Supp.2d 1322, 1330 (M.D. Fla. 2010) (shorter time to trial in transferee forum did not favor transfer given that "the time involved in a transfer will likely eliminate that difference, if not cause a greater delay."). Therefore, this factor does not favor transfer, particularly given that this Court "stands ready to give both parties a full and fair hearing in an expeditious manner." *DocRX, Inc.*, 738 F. Supp. 2d at 1257.

"'The plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations.'" *Robinson, supra,* 74 F.3d at 260 (citation omitted). Axelrod has not satisfied his burden of establishing that this case represents one of those rare situations warranting the disturbance of plaintiff's choice of forum. *See In re Ricoh Corp., supra,* 870 F.2d at 573 ("The federal courts traditionally have accorded a plaintiff's choice of forum considerable deference. . . . Thus, in the usual motion for transfer under section 1404(a), the burden is on the movant to establish that the suggested forum is more convenient."). Accordingly, Axelrod's § 1404(a) motion to transfer venue (Doc. 14) is due to be **DENIED**.

## CONCLUSION

For the reasons set forth above, it is **RECOMMENDED** that the Court **DENY** Defendant's motion to dismiss for lack of personal jurisdiction and also **DENY** Defendant's motions to transfer venue pursuant to 28 U.S.C. §§ 1404(a), 1406(a), or 1631 (*see* Docs. 11 & 14).

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within

fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b); S.D. Ala. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 27th day of June, 2017.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**

44